**FILED**
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

JUL 0 8 2020

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

| | |
|---|---|
| CHESTER E. BATES | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| WRIGHT MEDICAL TECHNOLOGY, INC., | ) |
| | ) |
| Defendant | ) |

Case No. 4:20-cv-813-DPM

JURY TRIAL DEMANDED

This case assigned to District Judge Marshall
and to Magistrate Judge Harris

---

## COMPLAINT FOR DAMAGES

---

Plaintiff, Chester E. Bates, files this Complaint for damages against Defendant Wright Medical Technology, Inc. ("Wright" or "Wright Medical"), a Delaware corporation whose principal place of business is in Memphis, Shelby County, Tennessee, respectively showing the Court the following:

### NATURE OF ACTION

1.     This is a Complaint for damages associated with metal wear debris, corrosion and resultant metal ions from a failed Wright Medical Conserve® metal-on-metal hip implant.

2.     For many years, Defendant has known its hip replacement device – the Wright Medical Conserve® Total Hip System ("Conserve® Total Hip System," "Conserve® Device," or the "Device") – was prone to fretting and corrosion and had a propensity to fail within a few years of implantation despite that hip implant devices typically last up to twenty years or more. The articulating pieces (femoral ball and cup) of Defendant Wright's Device are comprised of a cobalt and chromium ("CoCr") alloy. As designed, the Device's metal-on-metal components generate

metal debris, corrosion and metal ions, which cause dangerously elevated blood levels of CoCr ions, adverse tissue reactions, pseudotumors, necrosis, bone loss and other adverse medical events in patients. As a result of the Device's defects and Wright's tortious acts/omissions, Plaintiff and many other patients who received these Devices endured unnecessary pain and suffering; debilitating lack of mobility; and a subsequent surgery to replace the defective Device, giving rise to more pain and suffering, a prolonged recovery time, and an increased risk of complications and death from surgery.

## PARTIES

3.     At all relevant times hereto, Plaintiff Chester E. Bates, was and is an adult resident and citizen of the State of Arkansas, residing in England, Lonoke County, Arkansas.

4.     Defendant Wright Medical Technology, Inc. ("Wright" or "Wright Medical") is a Delaware corporation, with its principal place of business at 1023 Cherry Road, Memphis, Shelby County, Tennessee 38117, and is registered to do business in the State of Tennessee, and at all times relevant hereto did business in the State of Tennessee and in the State of Arkansas. Defendant Wright is a wholly owned subsidiary of Defendant Wright Medical Group, Inc.  Wright may be served with process by serving its registered agent for service, Corporation Service Company, at 2908 Poston Avenue, Nashville, Tennessee 37203-1312, or at Wright's principal place of business at 1023 Cherry Road, Memphis, Tennessee 38117-5423.

5.     Defendant Wright was, at all relevant times, engaged in the business of designing, developing, manufacturing, distributing, selling, marketing and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, various prosthetic orthopedic products, including the Conserve® Total Hip System at issue in this civil action.

2

## STATEMENT OF JURISDICTION AND VENUE

6.     This Court has original jurisdiction under 28 U.S.C. §1332 because the controversy is between citizens of different states, as described above, and the amount in controversy exceeds the sum or value of $75,000, exclusive of costs and interest.

7.     Wright is subject to the Court's personal jurisdiction because at all times relevant hereto, it transacted business in, and continues to transact business in the State of Arkansas. Wright has sufficient minimum contacts with Arkansas such that exercise of jurisdiction over Wright would not offend traditional notions of fair play and substantial justice.

8.     Wright is deemed to reside in any judicial district in which it is subject to personal jurisdiction. As Wright is subject to personal jurisdiction in Arkansas, and because a substantial part of the events and omissions giving rise to this claim occurred in this judicial district, venue is proper in this Court. The amount in controversy exceeds $75,000.00 based on Plaintiff's extensive medical bills from her revision surgery and associated treatment, which by themselves exceed this threshold. He also seeks damages for pain and suffering, in an amount that equals many multiples of this threshold.

9.     The private interests of the parties favor the forum offered by the United States District Court for the Eastern District of Arkansas because it provides relative ease of access to sources of proof, will substantially reduce the cost of litigation for the parties, including, but not limited to, obtaining the attendance of witnesses, and will provide for expeditious and practical litigation.

10.    At all times relevant hereto, Wright advertised, promoted, marketed, sold and/or distributed the defective Conserve® Total Hip System, including the Conserve® femoral head and Conserve® acetabular cup, throughout the United States.

3

## FACTUAL ALLEGATIONS

### A.  The Device and Its Regulatory History

11.     Between approximately 2003 and 2011, Wright marketed and sold several metal-on-metal ("MoM") hip replacement devices, two of which were the Conserve® Total Hip Device and the Conserve® Resurfacing Device.

12.     The Conserve® Total Hip Device was developed for use in total hip replacements and included four metal components: (1) a stem inserted into the patient's femur, (2) a neck that connects the stem to (3) a BFH metal femoral head (which Wright called the "BFH" – for "big femoral head" - and the A-Class BFH), and (4) an acetabular shell.

13.     The Conserve® Total Hip Device, like all hip implant products, is regulated by the Food and Drug Administration ("FDA") as a Class III Medical Device, pursuant to 21 U.S.C. § 360c and 21 C.F.R. § 88 888.3330, Prosthetic Devices.

14.     For Class III devices, the FDA requires compliance with either the Pre-Market Approval process ("PMA") or the section 510(k) substantial equivalence pre-market clearance process before a manufacturer can market and sell a total hip replacement or hip resurfacing device in the United States.

15.     On July 1, 2002, the FDA gave Wright 510(k) clearance to market the Metal Transcend Articulation System (Larger Sizes), which was re-branded the "Conserve" and is referred to herein as the Conserve® Total Hip Device.

16.     Several different acetabular shells were developed for use with the Conserve® Devices, including:  the "Thick Shell" (with a 5 mm wall thickness), the "Thin Shell" (with a 3 to 4 mm wall thickness), the "Spiked Shell" (with spikes), and the "HA Shell" (with a hydroxyl

apatite coating to facilitate bony ingrowth). (K041425 (Thick Shell); K031963 (Spiked Shell); K042530 (HA Shell); K113322 (Thin Shell)).

17.     Wright obtained FDA 510(k) clearance to market the Spiked Shell (in 2003), the HA Shell (in 2004), and the Thick Shell (in 2004). (*See id.*)

18.     Wright also received FDA 510(k) clearance to market the A-Class femoral head in 2005 (K051348).

19.     But, despite that more than 90% of the acetabular shells that Wright marketed and sold with Conserve® Devices between 2003 and 2011 were Thin Shells, Wright failed to seek FDA 510(k) clearance to market the Thin Shell until November 2011, and did not receive any FDA clearance to market the Thin Shell until February 2012 (K113322).

20.     By February 2012, Wright had no market for the Conserve® Hip Devices and had, in fact, stopped marketing the Conserve® Devices in June 2011.

**B.  Wright's History with the Device.**

21.     Wright purchased Orthomet, Inc. to obtain a stake in the new and profitable metal-on-metal hip replacement device market. In the early 1990s, after establishing itself in small joint orthopedics and total knee replacements, Wright decided to move into the hip replacement market.

22.     Wright purchased Orthomet, Inc. in December 1994 because Orthomet was in the development stages of two MoM hip systems: the Transcend Metal-on-Metal Total Hip System (which eventually became the Conserve® Total Hip Device) and the Conserve® Resurfacing Device.

23.     Orthomet hired Dr. Harlan Amstutz, a McKee fellow, a MoM proponent, and the designer of the Tharies (a previous failed Zimmer resurfacing device), as the lead surgeon designer for the Conserve® Devices.

24.     As of the mid-1990s, the majority of the devices available for hip replacement utilized a press fit metal shell with porous coating and a separate polyethylene liner with a ceramic or metal head. Although Wright recognized that this construct saw good success, Wright also recognized the substantial potential for a metal-on-metal articulation in hip replacement as an alternative to using polyethylene.

25.     In the late 1990s, Wright hoped to be the only orthopedic medical device company to offer a total resurfacing device in the United States, but because the McMinn System was already on the market in European countries, Wright needed to move quickly to get the Conserve® Resurfacing Device on the U.S. market.

26.     Wright considered the Conserve® Resurfacing Device as a product that had the potential to capture a significant market share in the United States.

27.     In July 1993, Al Lippincott from Orthomet prepared a product initiation request for a metal-on-metal system, recognizing that, Orthomet had an opportunity to establish itself as a forerunner in orthopedic research with development of a new metal-on-metal hip system and could gain substantial market share of the hip implant market.

28.     At that time, Orthomet recognized that several companies, including Sulzer, DePuy, Smith & Nephew, Zimmer, and others were currently re-evaluating metal-on-metal systems.

29.     In November 1995, Wright Medical employees Al Lippincott and Robert L. Conta, then Vice President of Development & Technology, attended a four-day conference, chaired by Dr. Harlan C. Amstutz, and organized by the Joint Replacement Institute in Los Angeles. There, industry professionals and experts held a four-day MoM summit, open discussion, debate, and dialogue about metal-on-metal hips, addressing the technology, the clinical significance of wear

debris, implant tribology, the need for changes, the types of studies needed to make sure they were safe, and similar issues.

30.     Conclusions drawn at the MoM summit included the possibility that MoM is not a good alternative to polyethylene, and that more needed to be learned and studied regarding the risks associated with MoM bearing surfaces.

31.     In 1995, prior to marketing the Conserve® Devices, Wright was notified by leading surgeons and designers of a number of major MoM risks that demanded further testing, such as: metal toxicity, inflammation, bone loss, allergic reaction, local tumor formation, systemic effects, soft tissue necrosis, osteolysis, and blood-borne metal ions.

32.     Yet Wright did not conduct any studies to investigate these known risks prior to marketing its Conserve® Devices and components, and it has never performed any tests related to most of the "hot-button" issues that forced surgeons to reject metal-on-metal implants in the 1970s.

## C. The Conserve Thin Shell Never Received PMA Approval and Was a Regulatory and Clinical Failure.

33.     In 2000, Wright initiated clinical studies of its Conserve® Plus Hip Resurfacing device, which was conducted under Investigational Device Exemption ("IDE")[1] G990328.

34.     In September 2003, Wright submitted a Pre-Market Approval (PMA) submission, #P030042, for its Conserve® Plus Resurfacing Hip System, which utilized a Thick Shell (with a 5mm wall thickness).

---

[1] An IDE allows a non-cleared, non-approved medical device to be used as part of a clinical study to collect data as to safety and efficacy to support a PMA application or 510(k) premarket notification submission to the FDA.

35.     Following a January 2004 inspection related to the Conserve® Plus Resurfacing Hip System PMA #P030042 and IDE study G990328, Wright was cited for failure to properly monitor studies and failure to report adverse events.

36.     Dr. Harlan Amstutz was similarly cited.

37.     In July 2004, Wright was placed on Integrity Hold for regulatory violations related to the Conserve® Plus Resurfacing Hip System PMA #P030042 and IDE study G990328.

38.     Due to the FDA's Integrity Hold, Wright could not submit products for approval without an independent third party first reviewing its submission. Wright contracted with Phiama Consulting and Health Policy Associates to conduct a review of device submissions to ensure the overall quality of Wright's future US regulatory submissions.

39.     The FDA continued to institute an Integrity Hold for Wright's products for over three years until September of 2007.

40.     Wright further sought to add a Thin Shell (with a 3.5mm wall thickness) to its Resurfacing PMA submission. But the clinical data from Wright's Conserve® Plus Resurfacing Device's Thin Shell IDE cohort showed such high failures that Wright withdrew the Thin Shell from its PMA application at least twice between 2003 and November 2011, due to the high failure rate and lack of follow-up.

41.     Wright's Conserve® Resurfacing Device IDE clinical study results utilizing the Thin Shell showed a revision rate - a failure of Conserve® device requiring surgery to replace the components - of 18.6% of the patients at 24+ months.

42.     Nonetheless, and despite its IDE clinical studies demonstrating the Thin Shell's clinical failure, from 2003 through 2011, Wright marketed the Conserve® Devices utilizing the Thin Shell – a device never PMA approved and not 510(k) cleared by the FDA until 2012.

8

43.     Wright never informed surgeons or patients that its own clinical studies revealed that the Thin Shell caused an extraordinarily high revision rate of 18.6% at the 24 plus month period.

44.     The FDA found Wright had under-reported Thin Shell failures and that the Thin Shell's revision rate exceeded 33% in Wright's clinical studies.

## D. Wright Obtained Pre-Marketing 510(k) Clearance For Some – But Not All – Conserve® Components.

45.     Wright sought FDA clearance to market its Conserve® Total Hip Device through the 510(k) "substantial equivalence" process.

46.     A 510(k) notice is a premarket submission in which the manufacturer claims the submitted device is substantially equivalent to a predicate device that is already on the market.

47.     Wright represented that its first MoM device, the Transcend (later renamed "Conserve"), was substantially equivalent to the previously marketed McKee-Farrar device.

48.     The McKee-Farrar device, a MoM design first used in 1960, was removed from the market in the 1970s because of problems with osteolysis, inflammation, cystic responses, cyto-toxic metal ions and tissue reactions necessitating revisions in 50% of the implants, according to the designer, Dr. George McKee.

49.     Due to the poor clinical results of the McKee-Farrar device, the FDA refused to allow it as an acceptable predicate design and demanded testing for Wright's Metal Transcend Articulation System (1997) submission (K964627).

50.     The 1997 510(k) submission for the Metal Transcend Articulation System K964627 was never cleared for marketing.

51.     In 2001, Wright obtained 510(k) clearance for its modular Metal Transcend Articulation System, consisting of three components (a screw-fit 7(K004043), metal shell, metal liner, and metal head) intended for use in total hip arthroplasty.

52.     In 2002, Wright received 510(k) clearance to market the monoblock Metal Transcend Articulation System (Larger Sizes) for use in total hip arthroplasty, utilizing a one-piece (or "monoblock") Thick Shell (with a 5mm wall thickness) and a metal femoral head based on its purported equivalence to the Metal transcend Articulation System (K004043). (K021349).

53.     In August 2005, Wright received FDA clearance to market the A-Class Conserve® Total Femoral Head (K051348).

54.     As Wright touted its "soon to be approved resurfacing device" to surgeons and customers, Wright marketing personnel and agents realized that the Conserve® could be sold as a total hip process and also had great promise for huge profits as a total hip replacement.

E.  **Wright Dodged the FDA Through Inappropriate Use of a "Letter to File," In Lieu Of the 510(k) Process, For the Conserve® Thin Shell.**

55.     In 2003, Wright introduced its Conserve® Thin Shell (with a 3.5mm wall thickness) to its Conserve® Devices without notification to FDA or 510(k) clearance, let alone PMA.

56.     To avoid the FDA's premarket approval ("PMA") and 510(k) processes, Wright used a "Letter to File," an internal Wright decision to market the Thin Shell without notice to FDA. This regulatory shortcut for the Conserve® Thin Shell was based on the supposed "Minor Modification" to other substantially similar devices on the market.

57.     Wright marketed the Conserve® Thin Shell for more than eight (8) years without FDA notice or review, despite substantial clinical evidence collected through its Conserve® Plus Resurfacing Thin Shell IDE study that the Conserve® Thin Shell had poor outcomes.

58.     Wright later acknowledged that a design change affecting safety and efficacy to a device is not appropriate for an internal Letter to File.

59.     A wall thickness change from 5mm for the Conserve® Thick Shell to 3.5mm for the Conserve® Thin Shell is a modification that affects the safety and effectiveness of the Conserve® Devices, yet Wright did not conduct any clinical testing beyond the failed IDE to evaluate whether the change from a Thick Shell to a Thin Shell affected safety or efficacy.

60.     Because the change from the 5mm Conserve® Thick Shell to the 3.5mm Conserve® Thin Shell was significant, and Wright did not account for the risk from this change in its Letter to File MM03-0004, Wright's decision to utilize a Letter to File in lieu of 510(k) clearance was incorrect.

61.     Instead of utilizing a unilateral Letter to File, Wright was required to obtain 510(k) clearance to legally market the Conserve® Thin Shell.

**F.   Wright Belatedly Obtained (Post-Market) 510(k) Clearance for the Thin Shell.**

62.     In September 2011, Wright finally acknowledged that the Thin Shell design marketed under the February 13, 2003 Letter to File "Minor Modification" presented a new worse case (thinner shell) and therefore should have been submitted to FDA for review under the 510(k) process before marketing and sale of the Conserve® Thin Shell began in 2003.

63.     As Wright consistently collected information questioning the safety and efficacy of its Conserve® Devices and their components, it continued to promote the Conserve® Hip Devices using false and misleading data.

64.     For example, Wright continued to advertise that the Conserve® A-Class Device generated fewer metal ions even though its own studies suggested the opposite conclusion.

## G. **Wright Aggressively Marketed the Device as Appropriate for Active Patients.**

65.     The Conserve® Hip Device's use of BFH technology and A-Class metal was marketed to surgeons as capable of increasing range of motion, decreasing dislocation issues, lower wear, and biocompatibility, all of which were presented as significant benefits for young and active recipients as well as anyone possessing a high-demand hip.

66.     When Wright marketed the Conserve® Total Hip Device to surgeons, it claimed the device was ideal for young, very active patients because post-hip-replacement, those patients could be as active as they wanted to be, with a greater range of motion without dislocation or wear related concerns.

67.     Wright hired professional tennis player and celebrity Jimmy Connors as a spokesperson of Wright to endorse and market the Conserve® Devices. Wright represented that with his new Conserve® Device. Mr. Connors was back on the tennis court in 6 weeks. a result that should be expected by patients who were implanted with the Conserve® Devices

68.     In marketing the Conserve® Devices. Wright used marketing materials (websites. journal ads. brochures. pamphlets. patient testimonials. endorsements. newspaper articles and other PR) aimed at surgeons and younger. more active consumers who wanted to return to the following strenuous physical activities. among others. that Wright advertised:

    a.   Surfing;

    b.   Yoga;

    c.   Skiing;

    d.   Martial Arts, including competition levels;

    e.   Hockey;

    f.   Ice Skating;

g. Motorcycling;

h. Horseback rides;

i. Tennis;

j. Golf;

k. Soccer;

l. Football;

m. Mountain climbing;

n. Running, including marathons and triathlons;

o. Hiking;

p. Biking, including trail riding;

q. Swimming;

r. Racquetball;

s. Active military duty;

t. Competitive wrestling; and

u. Kayaking.

69.    Representative ads include:



70.     Wright's marketing of the **Conserve®** Devices included the following testimonials from patients and surgeons:

   a.   "Before the surgery I couldn't run.  I couldn't play soccer.  Now, there's no pain in the joint at all.  Hip replacement gave me my life back."

   b.   "Because the procedure allows him to be as aggressive as he wanted to be, there -- there was no reason for me to tell him to hold back."

   c.   "Some patients have been able to pursue more vigorous activities, including martial arts, hockey, running marathons, even climbing Mount Kilimanjaro."

   d.   "Wright Medical which makes the Conserve® Total hip said the hip replacement lasts 25 to 30 years."

   e.   "Just six weeks after his [minimally invasive surgical] hip procedure, [Jimmy Connors] completed filming for a tennis training DVD."

71.     When Wright marketed the Conserve® Total Hip Device to surgeons. it claimed that the device was fully biocompatible and that the device had good longevity.

72.     Wright also knew researchers were advising against using metal-on-metal implants in female patients and its own internal information showed dangerously high revision rates in women.

73.     Nonetheless, Wright continued to aggressively market its products for use by women.

74.     Wright's partners at the Oxford Group (Richie Gill) reported unfavorable findings on the Conserve® Devices, including a strong suggestion of pseudotumors associated with MoM wear and recommended that Conserve® Devices not be implanted in women.

75.     Wright also knew researchers were advising against putting the similar DePuy ASR devices in women, and that its partners in Oxford planned to publish a paper warning against MoM hip resurfacing in young females.

76.     But Wright continued to market the Conserve® Devices to younger, active lifestyle women; including younger women engaging in competitive martial arts, ice skating, running, dirt biking, even those who desired to be "physically aggressive."

## H. **Wright Minimized the Known Risk of Elevated Metal Ion Levels.**

77.     Wright never provided any information to surgeons regarding what was considered a dangerous cobalt or chromium ion level for a patient with a MoM Conserve® Device.

78.     Wright never told surgeons about the risks and problems associated with its Conserve® Total Hip Device, including metallosis.

79.     The biggest concern Wright faced in selling the Conserve® Devices was the issue of metal ion release. as surgeons' top concern was the metal ions.

80.    Before, during, and after Wright designed, developed, manufactured, marketed, and sold its Conserve® Devices, Wright knew of the principles and concerns associated with MoM devices generating wear debris and releasing toxic cobalt and chromium heavy metal ions.

81.    Despite its knowledge that metal ions associated with MoM hips presented significant risks, Wright worked to convince surgeons that metal ions were not an issue with the Conserve® Devices.

82.    Wright was aware as of 1998 that research indicated that at three years post-implantation, there was as much as a 5X increase in the concentration of chromium in the serum and 8X increase in the concentration of chromium in the urine for metal-on-metal versus metal-on-poly hip replacement devices.

83.    No later than 2003, Wright recognized that metallic particulate debris is approximately an order of magnitude smaller than PE debris, so that even low rates of volumetric wear could lead to large numbers of particles.

84.    Before, during, and since Wright designed, developed, manufactured, marketed, and sold its Conserve® Devices, Wright knew that surgeons were concerned about metal ion release and its effects on the body.

85.    Before, during, and since Wright designed, developed, manufactured, marketed, and sold its Conserve® Devices, Wright knew patients with MoM hip implants exhibited 10 times higher concentrations of metal ions compared to patients with MoP hip implants.

86.    Before, during, and since Wright designed, developed, manufactured, marketed, and sold its Conserve® Devices, Wright knew that Cobalt and Chromium ions cause metallosis, necrosis, inflammation, bone loss, cup loosening, ALVAL and pseudotumors.

87.     Before, during, and since Wright designed, developed, manufactured, marketed, and sold its Conserve® Devices, Wright knew there were reports that Cobalt and Chromium ions have toxic effects.

88.     Before, during, and since Wright designed, developed, manufactured, marketed, and sold its Conserve® Devices, Wright had available literature that indicated that combined ion levels of Cobalt and Chromium of 5 ppb generated immune suppression.

89.     Before, during, and since Wright designed, developed, manufactured, marketed, and sold its Conserve® Devices, Wright had literature available that indicated that cobalt and Chromium ion levels at 7 ppb were considered elevated and indicated that a patient and her physicians should consider revision.

90.     Before, during, and since Wright designed, developed, manufactured, marketed, and sold its Conserve® Devices, Wright did not know how to evaluate the significance of Cobalt and Chromium metal ion levels.

91.     Before, during, and since Wright designed, developed, manufactured, marketed, and sold its Conserve® Devices, Wright did not know what levels of Cobalt and/or Chromium ion levels would or could cause harm.

92.     Before, during, and since Wright designed, developed, manufactured, marketed, and sold its Conserve® Devices, Wright did not know the long-term consequences to patients of exposure to Cobalt and Chromium ions.

93.     Despite the concerns for the effect, danger and damage potentially caused by Cobalt and Chromium ions, and despite not knowing what ion levels would be safe, acceptable, injurious or dangerous, Wright undertook no biocompatibility or any other testing to determine whether metal-ion release from the Conserve® Device was safe.

94.     Before, during, and since Wright designed, developed, manufactured, marketed, and sold its Conserve® Devices, Wright never tried to determine what levels of Cobalt or Chromium are toxic.

95.     Before, during, and since Wright designed, developed, manufactured, marketed, and sold its Conserve® Devices, Wright did no testing to assess the risk of metal ion release or the effects of metal ion release on the human body.

96.     Before, during, and since Wright designed, developed, manufactured, marketed, and sold its Conserve® Devices, Wright conducted no clinical studies to determine or evaluate the local or systemic effect of Cobalt and Chromium ions.

97.     Before, during, and since Wright designed, developed, manufactured, marketed, and sold its Conserve® Devices, Wright never did any testing to determine the risk posed to patients from exposure to Cobalt and Chromium ions.

98.     Wright recognized that surgeons' biggest concern about the use of metal-on-metal hip devices was the generation of metal ions. Therefore, Wright had to convince surgeons that metal ions would not be an issue with the Conserve® Hip Implant.

99.     Minimizing metal ions was a huge concern for Wright in marketing its Conserve® Devices and it focused extensively on minimizing metal-ion concerns through publications and speakers.

100.    Wright utilized consulting surgeon Key Opinion Leaders' ("KOL's") presentations to orthopedic groups and peer reviewed data, paid-for scientific data publications, celebrity endorsements, and sales representative training, among other avenues, to falsely assuage metal-ion concerns and market the Conserve® Device.

101.   Throughout the Conserve® Devices' marketed lifespan, Wright consistently boasted in its marketing that metal ions from Conserve® Device are harmless.

102.   In fact, Wright's OrthoRecon marketing department disregarded field concerns over metal ion issues and told surgeons that Wright had no negative reports for metal ion issues.

103.   Wright did not inform surgeons or potential patients of its concerns or lack of knowledge regarding the release of Cobalt and Chromium ions from Conserve® Total Hip Implants, despite acknowledging that surgeons and patients were concerned about the issue.

104.   In fact, Wright, as early as 2002, told its sales personnel, who were in direct contact with surgeons, that, "the effects of metal ion release are known and have been demonstrated to be safe," which was the equivalent of decriminalizing metal ions.

### I.   Wright Studied Metal Ions Solely to Support A-Class Sales.

105.   Wright decided to run metal ion studies, not to determine safe levels of metal ions, but instead to be able to market that its Conserve® Total Hip Device utilizing an A-Class femoral head (which utilized a "harder" Cobalt and Chromium metal alloy than the standard femoral head) would generate fewer metal ions than Wright's competitor and thus Wright could sell the A-Class device at a higher price.

106.   Wright aggressively marketed its A-Class metal, which it contended resulted in less wear, less metal debris and, by implication, fewer metal ions.

107.   Wright utilized taglines such as "Reduced Wear, Increased Longevity," "A-Class Never Compromise," and "A Hip for Life" in marketing it's a-Class BFH technology with the Conserve® Total Hip Device.

108.   Wright ignored that its A-Class metal ions studies were a failure, demonstrating that less wear did not translate into fewer metal ions.

109.     Even Wright's internal metal ion studies conducted by key **Conserve®** Device KOLs and surgeon consultants such as Paul Beaule, M.D., Josh Jacobs, M.D., and Koen DeSmet, M.D. could not prove that the generation of less wear debris correlated with fewer metal ions, despite Wright's touting this alleged A-Class design advantage.

**J.   Wright's Representations and Reasonable/Justifiable Reliance.**

110.     Wright also told Dr. Barnes, an orthopedic surgeon in Little Rock, Arkansas, that the cobalt chromium cup should last longer than a traditional Metal/Poly liner, and that there were no known issues associated with cobalt and chromium ions.

111.     Based on Dr. Barnes' information from Wright about the benefits of the **Conserve®** Total Hip Device and no known risks from metal ions, and his recommendation, Plaintiff elected to proceed with an elective right THR to implant a metal-on-metal **Conserve®** Total Hip Device, utilizing the Dynasty Shell, and not another type of available hip such as the ceramic/poly.

112.     Dr. Barnes implanted the Wright **Conserve®** systems in Plaintiff, as noted above.

113.     Dr. Barnes indicated that Plaintiff's **Conserve®** Total Hip Device had failed due to "metal on metal disease," i.e. metallosis, i.e., acute onset of pain, soft tissue inflammation, tissue necrosis, etc.

114.     Numerous physicians who previously had Wright consulting contracts have testified that, had they been aware of the risks back in the early to mid-2000s when they first started implanting the Conserve® hip replacement Devices, they would not have chosen those implants.

115.     On information and belief, Dr. Barnes is aware or should be aware of the risks associated with the **Conserve®** hip implant system such as adverse reaction to metal debris, metal ions, metallosis, necrotic tissue, and ALVAL, that he was not aware of at the time of Plaintiff's implant surgeries in 2007.

116.    If Dr. Barnes had known in 2007 what he knows now about the risks from metallosis from the Conserve® Total Hip Device, it is unlikely that he would have implanted the Wright MoM systems in Plaintiff. On information and belief, he implanted numerous patients with metal-on-metal hip systems.

117.    Wright marketed that the Conserve® Devices experienced acceptably low failure rates, despite real revision rates reported via medical device registries and surgeons' actual revisions demonstrating that the Conserve® Devices had a statistically unacceptably high failure rate.

118.    Wright has never reported the Conserve® Devices' high failure rates to surgeons, to patients with implanted Conserve® Devices, or to the public.

119.    Wright continued to market the Conserve® Devices even as its own KOLs, consultants, researchers and surgeons were reporting high failure rates and other problems with the implant, and even discontinuing use of the Conserve® Devices.

120.    Wright received complaints and reports of unacceptable failure rates of its Conserve® Devices from Brad Penenberg, M.D., a Wright KOL, consultant, Peer-to-Peer trainer, premier Los Angeles surgeon and Conserve® Devices royalty recipient, who concluded the Conserve® Device was not a successful product and stopped using them because of problems he experienced with the Conserve® Devices starting in 2007.

121.    Although Patrick Fisher, Director of Hip Marketing, admitted that it was significant that Wright's most prominent, highest paid consultant thought the Conserve® Device was a failure, Wright never shared that information with other surgeons or the public.

122.    C. Lowry Barnes, M.D., from Little Rock, Arkansas, a Wright KOL, consultant, and Peer-to-Peer trainer, as well as the treating surgeon for this particular Plaintiff, complained about the Conserve® Devices and stopped using them.

123.    G. Lynn Rasmussen, M.D., and his partner, Kent Samuelson, M.D., both Wright KOLs, consultants and high-volume Conserve® Device implant surgeons in Salt Lake City, Utah, stopped using the Conserve® Devices because of unacceptably high failure rates.

124.    Michael Andersen, M.D., a Wright KOL, product champion, Conserve® Devices royalty recipient from Germantown, Wisconsin, had problems with the Conserve® Devices that were known to Wright.

125.    Michael Dunbar, M.D., from Halifax, Nova Scotia, reported a 20% Conserve® Device failure rate to Wright in March 2008 and discontinued using the Conserve® Devices.

126.    Edward Sparling, from Vancouver, Washington, a high-volume Wright surgeon, KOL, consultant and IDE participant, reported problems with the Conserve® Devices to Wright and stopped using them in April 2009.

127.    Richard Weiner, M.D., from Palm Beach, Florida, a high-volume Wright surgeon, reported high Conserve® Device failure rates to Wright, advised Wright that the Conserve® Devices should never be implanted in women, and stopped using the Conserve® Devices.

128.    Raymond Corpe, M.D., from Augusta, Georgia, a Wright KOL, consultant and high-volume Wright implant surgeon, complained to Wright about the Conserve® Devices and stopped using the Conserve® Devices.

129.    Vincent Fowble, M.D., from Jupiter, Florida, a Wright KOL, consultant and high-volume Wright implant surgeon, complained to Wright about the Conserve® Devices and stopped using the Conserve® Devices.

130.    Kace Ezzet, M.D., from La Jolla, California, reported high failure rates to Wright and as a result, stopped using the Conserve® Devices.

131.    Milton Smit, from Bradley, Illinois, a Wright KOL, consultant and high-volume Wright implant surgeon, complained to Wright about the Conserve® Devices' high failure rates and stopped using the Conserve® Devices.

### K.  Wright Ignored and Isolated Complaining Physicians.

132.    Wright created a smokescreen by isolating and blaming surgeons who reported failures, telling reporting surgeons that no other surgeons around the country were having failures.

133.    When distributor David J. Burke reported an increase in failed Conserve Devices to Wright, Wright told him that they were not having problems with the device and questioned whether the surgeons at issue had followed proper surgical protocol.

134.    Wright did not reveal these surgeon complaints and decisions not to use the Conserve® Devices to other surgeons, Wright's complaint department, Wright sales personnel or distributors, patients or the public.

135.    Internally, Wright's less-than-robust complaint department continued to receive complaints from all over the country regarding metal debris, reactions, pseudotumors and aseptic, lymphocyte-dominated vasculitis-associated lesions ("ALVAL") associated with the Conserve® Devices.

136.    Wright received registry data that showed increasing failures of the Conserve® Devices, including:  a 2008 Australian Bone & Joint Registry Report of a 16.4% failure rate; a 2009 UK National Joint Registry Report of a 7.4% failure rate; a 2011 UK National Joint Registry Report of a 8.35% failure rate; and a 2012 UK National Joint Registry Report of an 8.52% failure rate at five years.

137.   In response to an Association of British Healthcare Industries ("ABHI") position statement on MoM hip bearings, Wright acknowledged it knew from the start that the clinical performance of early MoM devices "frequently and matter-of-factly mentioned tissue reactions, metallosis, and revisions due to pain."

## PLAINTIFF'S INJURIES AND DAMAGES

### Plaintiff's Bilateral Wright Medical Hip Systems

138.   On or about Nov. 26, 2007, Plaintiff, had an artificial hip system made by Wright Medical implanted in his left hip ("Index Surgery") in a procedure known as a total hip arthroplasty (or "THA").

139.   Orthopedic surgeon C. Lowry Barnes, M.D. ("Dr. Barnes") performed the Index Surgery during which he implanted the System in Plaintiff.

140.   Plaintiff's Index Surgery was performed at CHI St. Vincent Infirmary in Little Rock, Arkansas.

141.   Dr. Barnes also implanted a similar system made by Wright Medical in Plaintiff's contralateral, or right, hip joint, on or about September 28, 2007, also at CHI St. Vincent Infirmary in Little Rock, Arkansas.

142.   Dr. Barnes did not breach any generally accepted standard of care in the field of orthopedic surgery in his care and treatment of Plaintiff or negligently cause any injury to Plaintiff in any of the following respects:

(a)     in the care or treatment that he provided to Plaintiff prior to beginning the hip implant surgery;

(b)     in the hip implant surgery he performed on Plaintiff; or

(c)    in the care or treatment that he provided to Plaintiff, subsequent to Plaintiff's hip implant surgery.

143.    Based upon the patient population that Wright intended its artificial hip devices to be implanted in, at the time of Plaintiff's Index Surgery, he was an appropriate patient to be implanted with the Systems.

144.    Dr. Barnes recommended the metal-on-metal Systems to Plaintiff and indicated that the Devices were appropriate for Plaintiff.

145.    Plaintiff reasonably relied upon Dr. Barnes in deciding to proceed with hip replacement surgery and have the Conserve® Total Hip System implanted.

146.    Before or during the course of Plaintiff's Index Surgery, Defendant arranged for the Total Hip Systems that were implanted in Plaintiff to be delivered to the Hospital and/or Dr. Barnes for implantation in Plaintiff.

147.    Defendant, directly or through its subsidiaries or affiliates, designed, manufactured, distributed and sold in the United States various prosthetic orthopedic devices, including the Total Hip Systems implanted in Plaintiff during the Index Surgeries, which included the following components in both hip joints:

- Wright Conserve® Total A-Class Heads
  44 mm

- Wright Dynasty® Shells
  58 mm

- Wright Dynasty® CoCr Liners
  44 mm

- Wright Profemur® TL Stems

- Wright Profemur® Necks

These Wright components are hereinafter collectively referred to as the "Conserve® Total Hip System" or the "Device."

148.    At the Index Surgeries, each of the components of Plaintiff's Conserve® Total Hip System in both hip joints were in substantially the same condition in all relevant respects as when they left Defendant's control.

149.    At all times relevant hereto, Plaintiff used the Conserve® Total Hip System implanted during the Index Surgeries in a normal and reasonably foreseeable manner.

150.    On or about January 24, 2019, Plaintiff reported to Dr. Barnes for bilateral revision surgery of his failed hip prostheses ("Revision Surgery"). Dr. Barnes recommended the revision surgery after Plaintiff presented with pain and symptoms consistent metallosis including pain, loss of mobility, and elevated cobalt and chromium ions.

151.    Plaintiff's Revision Surgery was necessary because the Devices failed due to adverse tissue reaction to metal debris, corrosion and resultant metal ions.

152.    The Revision Surgery was performed by Dr. Barnes at UAMS Hospital, in Little Rock, Arkansas. During the Revision Surgery, Dr. Barnes removed failed components of Plaintiff's Conserve® Total Hip Systems.

153.    But for the fact that the Conserve® Total Hip Systems had generated metal debris, metal ions and corroded causing it to fail and injure Plaintiff, Plaintiff's Devices were not otherwise in need of revision.

154.    On or about January 24, 2019, it was discovered that the Devices failed due to metal debris, corrosion, pseudotumors and resultant metal ions, due to the metal-on-metal design between the articulating surfaces, causing continuing and otherwise irreversible physical injury to

Plaintiff. Components in both the right and left hip systems were removed, including the metal liners and metal femoral heads. The shells and stems were retained.

155.    On or about the time of the bilateral revision surgery, the Conserve® Total Hip Systems implanted in Plaintiff's right and left hips were discovered to have failed as a direct and proximate result of the actions, conduct, negligence, and breach of duties of the Defendant, as alleged in this Complaint.

156.    The Conserve® Total Hip Systems (and their components), to include the Devices implanted in Plaintiff, were not merchantable, and were unreasonably dangerous for their intended and/or reasonably foreseeable uses in that:

    (a)    it was and is unreasonably dangerous under Arkansas product liability law as a result of one or more or a combination of the following:

        (i)    the Conserve® Total Hip Implant System, including Dynasty cups and Profemur stems, were manufactured/designed in such a manner as to generate CoCr metal debris, corrosion and resultant CoCr metal ions, thereby increasing the potential for failure;

        (ii)    the components were manufactured/designed in such a way as to make the articulating surfaces of the components susceptible to fretting and corrosion, thereby increasing the potential for failure; and

        (iii)    there may be other conditions or defects yet to be determined.

    (b)    it was dangerous to an extent beyond which could be contemplated by the ordinary consumer with the ordinary knowledge common to the community as to its characteristics in that:

27

(i)     the ordinary consumer would not contemplate that the Device would create metal debris, metal ions and corrosion or that premature revision surgery would become necessary only 11 years after implantation; and

(ii)    the ordinary consumer would not contemplate that the ordinary activities of daily living would result in the Device releasing harmful metal ions and metal debris in the consumer's body that caused adverse tissue reactions and other medical complications.

157.    The Device was not tested in design and development under conditions that were known would be encountered in the normal in vivo patient environment over substantial periods of time.

158.    The Device was not tested in design and development under the normal in vivo patient environmental conditions that were known would be encountered during normal use of the Device.

159.    The Device was not tested for the FDA Section 510(k) Premarket Notification Process under conditions that were known would be encountered in the normal in vivo patient environment.

160.    Wright's testing of the Device did not adhere to or meet FDA guidance.

161.    Wright knew the Device was failing from fretting and corrosion of the articulating surface prior to the day Wright provided its 510(k) submission to the FDA.

162.    Wright knew the Device was failing at higher than expected rates from fretting and corrosion of the articulating surface prior to the date of its implantation in Plaintiff during the Index Surgery.

163.    Wright knew the Device was failing at higher than expected rates due to fretting and corrosion prior to the date of Plaintiff's Revision Surgery, during which it was discovered that Plaintiff suffered from adverse tissue reaction to metal debris, metal ions and corrosion.

164.    Prior to the Index Surgery, Wright did not warn patients, surgeons, customers, or its sales representatives/distributors that the Device was known to be failing from metal debris and corrosion at higher than expected rates.

165.    On or about the time of his revision surgery, Plaintiff discovered the Device implanted in his left and right sides failed due to adverse tissue reaction from metal debris, metal ions and corrosion as a result of one or more or a combination of the foregoing unreasonably dangerous conditions.

166.    As a direct and proximate result of the failure of the Conserve® Total Hip System, Plaintiff has sustained injuries and damages, including, but not limited to:

       (a)    undergoing surgery to remove and replace the failed prosthesis;

       (b)    past and future pain and anguish, both in mind and in body;

       (c)    permanent diminishment of his ability to participate in and enjoy the affairs of life;

       (d)    medical bills associated with the revision surgery and recovery therefrom;

       (e)    future medical expenses;

       (f)    loss of enjoyment of life;

       (g)    loss of past and future earnings and earning capacity;

       (h)    disfigurement; and

       (i)    physical impairment.

## FEDERAL STATUTORY AND REGULATORY REQUIREMENTS

167.    Pursuant to federal law, a medical device is deemed to be adulterated if, among other things, it fails to meet established performance standards, or if the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements.  21 U.S.C. § 351.

168.    Pursuant to federal law, a device is deemed to be misbranded if, among other things, its labeling is false or misleading in any particular, or if it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof.  21 U.S.C. § 352.

169.    Pursuant to federal law, manufacturers are required to comply with FDA regulation of medical devices, including FDA requirements for records and reports, in order to prevent introduction of medical devices that are adulterated or misbranded, and to assure the safety and effectiveness of medical devices.  In particular, manufacturers must keep records and make reports if any medical device may have caused or contributed to death or serious injury, or if the device has malfunctioned in a manner likely to cause or contribute to death or serious injury.  Federal law also mandates that the FDA establish regulations requiring a manufacturer of a medical device to report promptly to FDA any correction or removal of a device undertaken to reduce a risk to health posed by the device, or to remedy a violation of federal law by which a device may present a risk to health.  21 U.S.C. § 360(i).

170.    Pursuant to federal law, the Secretary of Health and Human Services may prescribe regulations requiring that the methods used in, and the facilities and controls used for, the manufacture, pre-production design validation (including a process to assess the performance of a device, but not including an evaluation of the safety or effectiveness of a device), packaging, storage and installation of a device conform to current good manufacturing practice, as prescribed

in such regulations, to assure that the device will be safe and effective and otherwise in compliance with federal law.

171.    The regulations requiring conformance to good manufacturing practices are set forth in 21 C.F.R. § 820, *et seq.*  As explained in the Federal Register, because the Current Good Manufacturing Practice (CGMP) regulations must apply to a variety of medical devices, the regulations do not prescribe the details for how a manufacturer must produce a device.  Rather, the quality system regulations provide a framework of basic requirements for each manufacturer to use in establishing a quality system appropriate to the devices designed and manufactured and the manufacturing processes employed.  Manufacturers must adopt current and effective methods and procedures for each device they design and manufacture to comply with and implement the basic requirements set forth in the quality system regulations.

172.    Pursuant to 21 C.F.R. § 820.1(c), the failure to comply with any applicable provision in Part 820 renders a device adulterated under section 501(h) of the Federal Drug & Cosmetic Act ("the Act").  21 U.S.C. § 351.

173.    Pursuant to 21 C.F.R. § 820.5, each manufacturer shall establish and maintain a quality system that is appropriate for the specific medical device designed or manufactured.  "Quality system" means the organizational structure, responsibilities, procedures, processes and resources for implementing quality management.  21 C.F.R. § 820.3(v).

174.    Pursuant to 21 C.F.R. § 820.22, each manufacturer shall establish procedures for quality audits and conduct such audits to assure that the quality system is in compliance with the established quality system requirements and to determine the effectiveness of the quality system.

175.    Pursuant to 21 C.F.R. § 820.30(a), each manufacturer shall establish and maintain procedures to control the design of the device in order to ensure that specified design requirements are met.

176.    Pursuant to 21 C.F.R. § 820.30(d), each manufacturer shall establish and maintain procedures for defining and documenting design output in terms that allow an adequate evaluation of conformance to design input requirements.

177.    Pursuant to 21 C.F.R. § 820.30(e), each manufacturer shall establish and maintain procedures to ensure that formal documented reviews of the design results are planned and conducted at appropriate stages of the device's design development.

178.    Pursuant to 21 C.F.R. § 820.30(f), each manufacturer shall establish and maintain procedures for verifying the device design to confirm that the device design output meets the design input requirements.

179.    Pursuant to 21 C.F.R. § 820.30(g), each manufacturer shall establish and maintain procedures for validating the device design.  Design validation shall be performed under defined operating conditions on initial production units, lots or batches, or their equivalents.  Design validations shall ensure that devices conform to defined user needs and intended uses and shall include testing of production units under actual or simulated use conditions.

180.    Pursuant to 21 C.F.R. § 820.30(h), each manufacturer shall establish and maintain procedures to ensure that the device design is correctly translated into production specifications.

181.    Pursuant to 21 C.F.R. § 820.30(i), each manufacturer shall establish and maintain procedures for the identification, documentation, validation or where appropriate verification, review and approval of design changes before their implementation.

182.    Pursuant to 21 C.F.R. § 820.70(a), each manufacturer shall develop, conduct, control and monitor production processes to ensure that a device conforms to its specifications. Where deviations from device specifications could occur as a result of the manufacturing process, the manufacturer shall establish and maintain process control procedures that describe any process controls necessary to ensure conformance to specifications.  Such process controls shall include:

(a)    documented instructions, standard operating procedures (SOPs) and methods that define and control the manner of production;

(b)    monitoring and control of process parameters and component and device characteristics during production;

(c)    compliance with specified reference standards or codes;

(d)    the approval of processes and process equipment; and

(e)    criteria for workmanship which shall be expressed in documented standards or by means of identified and approved representative samples.

183.    Pursuant to 21 C.F.R. § 820.70(b), each manufacturer shall establish and maintain procedures for changes to a specification, method, process or procedure.

184.    Pursuant to 21 C.F.R. § 820.70(c), each manufacturer shall establish and maintain procedures to adequately control environmental conditions that could reasonably be expected to have an adverse effect on product quality, including periodic inspection of environmental control system(s) to verify that the system, including necessary equipment, is adequate and functioning properly.

185.    Pursuant to 21 C.F.R. § 820.70(e), each manufacturer shall establish and maintain procedures to prevent contamination of equipment or product by substances that could reasonably be expected to have an adverse effect on produce quality.

186.     Pursuant to 21 C.F.R. § 820.70(g), each manufacturer shall ensure that all equipment used in the manufacturing process meets specified requirement and is appropriately designed, constructed, placed and installed to facilitate maintenance, adjustment, cleaning and use.

187.     Pursuant to 21 C.F.R. § 820.70(h), each manufacturer shall establish and maintain procedures for the use and removal of manufacturing material which could reasonably be expected to have an adverse effect on product quality to ensure that it is removed or limited to an amount that does not adversely affect the device's quality.

188.     Pursuant to 21 C.F.R. § 820.70(i), when computers or automated data processing systems are used as part of production or the quality system, the manufacturer shall validate computer software for its intended use according to an established protocol.

189.     Pursuant to 21 C.F.R. § 820.72, each manufacturer shall ensure that all inspection, measuring and test equipment, including mechanical, automated or electronic inspection and test equipment, is suitable for its intended purposes and is capable of producing valid results.  Each manufacturer shall establish and maintain procedures to ensure that equipment is routinely calibrated, inspected, checked and maintained.

190.     Pursuant to 21 C.F.R. § 820.75(a), where the results of a process cannot be fully verified by subsequent inspection and test, the process shall be validated with a high degree of assurance and approved according to established procedures.  "Process validation" means establishing by objective evidence that a process consistently produces a result or product meeting its predetermined specifications. *See* 21 C.F.R. § 820.3(z)(1).

191.     Pursuant to 21 C.F.R. § 820.75(b), each manufacturer shall establish and maintain procedures for monitoring and control of process parameters for validated processes to ensure that

the specified requirements continue to be met.  Each manufacturer shall ensure that validated processes are performed by qualified individuals.

192.    Pursuant to 21 C.F.R. § 820.90, each manufacturer shall establish and maintain procedures to control product that does not conform to specified requirements.

193.    Pursuant to 21 C.F.R. § 820.100, each manufacturer shall establish and maintain procedures for implementing corrective and preventive action.  The procedures shall include requirements for:

(a)      analyzing processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product or other quality problems;

(b)      investigating the cause of nonconformities relating to product, processes and the quality system;

(c)      identifying the action(s) needed to correct and prevent recurrence of nonconforming product and other quality problems;

(d)      verifying or validating the corrective and preventative action to ensure that such action is effective and does not adversely affect the finished device;

(e)      implementing and recording changes in methods and procedures needed to correct and prevent identified quality problems;

(f)      ensuring that information related to quality problems or nonconforming product is disseminated to those directly responsible for assuring the quality of such product or the prevention of such problems; and

(g)     submitting relevant information on identified quality problems, as well as corrective and preventative actions, for management review.

194.    Upon information and belief, Wright's Conserve® Total Hip System is adulterated pursuant to 21 U.S.C. § 351 because, among other things, it failed to meet established performance standards and/or the methods, facilities or controls used for its manufacture, packing, storage or installation are not in conformity with federal requirements. *See* 21 U.S.C. § 351.

195.    Upon information and belief, Wright's Conserve® Total Hip System is misbranded because, among other things, it is dangerous to health when used in the manner prescribed, recommended or suggested in the labeling thereof. *See* 21 U.S.C. § 352.

196.    Upon information and belief, Wright's Conserve® Total Hip System is adulterated pursuant to 21 U.S.C. § 351 because Wright failed to establish and maintain CGMP for its Conserve® Total Hip System, including components, in accordance with 21 C.F.R. § 820, *et seq.*, as set forth above.

197.    Upon information and belief, Wright failed to establish and maintain CGMP with respect to the quality audits, quality testing and process validation for its Conserve® Total Hip System, including its components.

198.    As a result of Wright's failure to establish and maintain CGMP as set forth above, Wright's Conserve® Total Hip System was defective and failed, resulting in injuries to Plaintiff.

199.    If Wright had complied with the federal requirements regarding CGMP, Wright's Medical Conserve® Total Hip System would have been manufactured and/or designed properly such that it would not have resulted in injuries to Plaintiff.

200.    Plaintiff's injuries were both factually and proximately caused by the Defendant's defective Conserve® Total Hip System.

201. Plaintiff's injuries were both factually and proximately caused by the Defendant's unreasonably dangerous Conserve® Total Hip System.

202. Plaintiff further shows that he is entitled to recover for all noneconomic and compensatory damages allowed by law, including, but not limited to, pain and suffering for all pain and suffering that he has incurred as a result of the defective product, the follow-up surgery, rehabilitation, and constant pain that occurs as a result of the failure of the Device.

## WRIGHT'S WILLFUL, WANTON, MALICIOUS AND INTENTIONAL CONDUCT

203. Wright's failure to warn patients or surgeons that they had received product complaint data that indicated an increased risk of the foregoing adverse events associated with its Conserve® Total Hip System was willful and malicious and demonstrates a conscious disregard for the safety of patients.

204. Wright's failure to cease distribution of its Conserve® Total Hip System was willful and malicious and demonstrates a conscious disregard for the safety of its patients.

205. Wright knew or should have known, in light of the surrounding circumstances, that its conduct would naturally and probably result in injury or damage and continued the conduct with malice or in reckless disregard of the consequences, from which malice may be inferred. Accordingly, Plaintiff is entitled to an award of punitive damages.

## WARRANTIES

206. Statements and representations made by Wright, as set forth in this Complaint, constitute express warranties as to the performance, durability, and capabilities of Wright's Conserve® Total Hip System and its components.

207. By law, certain implied warranties of merchantability and fitness for intended use are applicable to Wright's Conserve® Total Hip System and its components.

208.    The failure of Plaintiff's Wright's Conserve® Total Hip System hip implants constituted a breach of the applicable express warranties of Wright.

209.    The failure of Plaintiff's Wright's Conserve® Total Hip System hip implants constituted a breach of the applicable implied warranties of merchantability and fitness for intended use are applicable to these products.

## LIABILITY

### FIRST CAUSE OF ACTION
### PRODUCTS LIABILITY DEFECTIVE DESIGN
### ARK. CODE ANN. § 4-86-102

210.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows:

211.    Plaintiff was damaged by the defective Conserve® Total Hip System.

212.    Wright was engaged in the business of manufacturing, selling and distributing the Conserve® Total Hip System.

213.    The Wright Conserve® Total Hip System used in Plaintiff's hip replacement surgery was supplied in a defective condition in its design, such that it would generate metal debris, metal ion cast off and corrosion at the articulating surface, rendering it unreasonably dangerous.

214.    Wright had a duty to place into the stream of commerce, manufacture, distribute, market, promote and sell the Conserve® Total Hip System so that it was neither defective nor unreasonably dangerous when put to the use for which it was designed, manufactured, distributed, marketed and sold.

215.    On and prior to June 25, 2007, Wright was engaged in the business of designing, manufacturing, marketing, distributing and selling orthopedic hip implants and did design, manufacture, distribute, market and sell the Device.

216.    Wright did in fact manufacture, sell, distribute, supply and/or promote the Device to Plaintiff and his implanting physician. Wright expected the Device it was selling, distributing, supplying, manufacturing and/or promoting to reach, and which did in fact reach, implanting physicians and consumers in the State of Arkansas, including Plaintiff and her implanting physician, without substantial change in the condition.

217.    At the time the Device left the possession of Wright and the time the Device entered the stream of commerce, it was in an unreasonably dangerous or defective condition. These defects include, but are not limited to, the following:

(a)    the Device was not reasonably safe as intended to be used;

(b)    the Device had an inadequate design for the purpose of hip replacement;

(c)    the Device contained unreasonably dangerous design defects, including an inherently unstable and defective design, to include the use of cobalt and chromium metal alloys (i.e. a CoCr modular Head and CoCr acetabular cup) as the articulating surface, which resulted in an unreasonably high probability of early failure;

(d)    the Device's unstable and defective design resulted in a hip prosthesis which had risks which exceeded the benefits of the medical device;

(e)    the Device was not appropriately or adequately tested before its distribution; and

(f)    the Device has an unreasonably high propensity for metal debris and fretting corrosion under normal and expected use of the Device.

218.    At the time of Defendant's initial design, manufacture, marketing and sale of the Device, a safer, feasible, alternative safer design for the Device was known and available to

Wright, including, but not limited to, a titanium shell with a polyethylene liner acetabular cup design.

219.    At the time of and subsequent to Wright's initial design, manufacture, marketing and sale of the Device, including prior to the time of Plaintiff's initial hip implant surgery, Wright had the ability to eliminate the unsafe character of the Device without impairing its usefulness.

220.    Wright's Conserve® Total Hip System Devices, were, therefore, defective in design or formulation in that, when they left Wright's hands, the foreseeable risk of harm from the product exceeded or outweighed the benefit or utility of the Device's particular design or formulation, and/or it was more dangerous than an ordinary consumer would expect, and/or it failed to comply with federal requirements for these medical devices.

221.    The foreseeable risks associated with the design or formulation of the Wright Conserve® Total Hip System devices include, but are not limited to, the fact that the design or formulation of the Conserve® Total Hip System Devices is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner, and/or it failed to comply with federal requirements.

222.    As a direct and proximate result of Plaintiff's use of Wright's Conserve® Total Hip System Device, as manufactured, designed, sold, supplied, marketed and introduced into the stream of commerce by Wright and/or its failure to comply with federal requirements, Plaintiff has suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

223.    As a direct and proximate result of Wright's defective product and tortious conduct as set forth herein, Plaintiff has suffered and will continue to suffer injuries, damages and losses, and is entitled to compensatory damages in an amount to be determined by the trier of fact.

224. The Conserve® Total Hip System's defective condition proximately caused Plaintiff's damages.

225. Plaintiff contends that Defendant's conduct is attended by circumstances of oppression, fraud, malice, willfulness, wantonness, or with reckless or conscious disregard for human life and safety, so as to warrant the imposition of punitive damages.

### SECOND CAUSE OF ACTION
### PRODUCTS LIABILITY DEFECTIVE MANUFACTURING
### ARK. CODE ANN. § 4-86-102

226. Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows:

227. Wright is the manufacturer, designer, distributor, labeler, seller, and/or supplier of orthopedic devices including the Wright Conserve® Total Hip System and its related components.

228. The Wright Conserve® Total Hip System and its related components that was manufactured, designed, sold, distributed, supplied and/or placed in the stream of commerce by Defendant, was defective and unreasonably dangerous in its manufacture and construction when it left the hands of Defendant in that it and they deviated from product specifications and/or applicable federal requirements for these medical devices, posing a serious risk of injury and death. The product was expected to, and did, reach the end user or consumer, without substantial change in the condition in which it was sold.

229. As a direct and proximate result of Plaintiff's use of Wright Conserve® Total Hip System and its related components as manufactured, designed, sold, supplied and introduced into the stream of commerce by Defendant and/or the failure to comply with federal requirements, Plaintiff has suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

230.    Plaintiff contends that Defendant's conduct is attended by circumstances of oppression, fraud, malice, willfulness, wantonness, or with reckless or conscious disregard for human life and safety, so as to warrant the imposition of punitive damages.

### THIRD CAUSE OF ACTION
### PRODUCTS LIABILITY FAILURE TO WARN
### ARK. CODE ANN. § 4-86-102

231.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows:

232.    Plaintiff was damaged by the defective Conserve® Total Hip System.

233.    Wright was engaged in the business of manufacturing, selling and distributing the Conserve® Total Hip System.

234.    At all times relevant herein, Wright was engaged in the design, development, testing, manufacturing, marketing and sale of the Conserve® Total Hip System devices.

235.    Wright designed, manufactured, assembled and sold the Conserve® Total Hip System devices to medical professionals and patients knowing that they would then be implanted in patients in need of hip prosthesis.

236.    Wright distributed and sold the Conserve® Total Hip System devices in a condition such that when they left its place of manufacture, in their original form of manufacture, they included the defects described herein.

237.    The Conserve® Total Hip System devices were expected to and did reach Plaintiff and his implanting surgeon, Dr. Barnes, without substantial change or adjustment in their condition as manufactured and sold by Wright.

238.    Defendant's Conserve® Total Hip System devices designed, developed, tested, manufactured, marketed and sold or otherwise placed into the stream of commerce by Wright were

in a dangerous and defective condition and posed a threat to any user or consumer of the Conserve®

Total Hip System devices.

239.    At all times relevant herein, Plaintiff was a person whom Wright should have

considered to be subject to the harm caused by the defective nature of the Conserve® Total Hip

System devices.

240.    Wright's Devices were implanted and used in the manner for which they were

intended.

241.    This use has resulted in severe physical and emotional and other injuries to Plaintiff.

242.    Wright knew or should have known through testing, adverse event reporting or

otherwise that its Conserve® Total Hip System devices created a high risk of bodily injury and

serious harm.

243.    Wright had a duty to warn its sales representatives/distributors, implanting

surgeons such as Dr. Barnes and patients such as Plaintiff, and Wright breached its duty in failing

to provide adequate and timely warnings or instructions regarding its Conserve® Total Hip System

devices and their known defects.

244.    Wright, furthermore, breached its duty to warn at pre-surgery and/or post-surgery

by   (a)   failing   to   adequately   communicate   the   warning   to   Defendants'   sales

representatives/distributors and/or to the ultimate users, i.e., Plaintiff and/or his implanting

physician; and/or (b) by failing to provide an adequate warning of the Device's potential risks.

245.    Adequate efforts to communicate a warning to the ultimate users were not made by

Wright (or its sales representatives/distributors) and, to the extent a warning was communicated

by Wright, the warning was inadequate.

246. The warnings (pre-surgery and/or post-surgery) to Plaintiff and his implanting physician about the dangers the Device posed to consumers were inadequate. Examples of the lack and/or inadequacy of Wright's warnings include, but are not limited to, one or more of the following particulars:

(a) the Device contained warnings insufficient to alert Plaintiff and Plaintiff's physicians as to the unreasonably high failure rate and propensity for generating metal wear debris, metal ion cast off and corrosion, associated with the Device, subjecting Plaintiff to risks which exceeded the benefits of the Device;

(b) the Device contained misleading warnings emphasizing the efficacy of the Device while downplaying the risks associated with it, thereby making use of the Device more dangerous than the ordinary consumer would expect;

(c) the Device contained insufficient and/or incorrect warnings to alert consumers, including Plaintiff, through its prescribing physicians regarding the risk, scope, propensity, frequency, duration and severity of the adverse events associated with the Device;

(d) the Device's warnings and instructions did not disclose that it was inadequately tested;

(e) the Device's warnings and instructions failed to convey adequate post-marketing warnings regarding the risk, severity, propensity, frequency, scope and/or duration of the dangers posed by the Device; and

(f) the Device's instructions were insufficient to alert physicians and consumers to the dangers it posed and to give them the information necessary to avoid or mitigate those dangers.

247.     Plaintiff used the Device for its intended purpose, i.e., hip replacement.

248.     Plaintiff could not have discovered any defect in the Device through the exercise of due care.

249.     Wright, as designer, developer, manufacturer, marketer and distributor of medical devices is held to the level of knowledge of an expert in the field.

250.     Plaintiff and his implanting physician did not have substantially the same knowledge about the Device as Wright who was the designer, manufacturer, and distributor of the Device.

251.     Wright reasonably should have known if its Device was unsuited for active individuals such as Plaintiff.

252.     As a direct and proximate result of Wright's failure to adequately communicate a warning and/or failure to provide an adequate warning and other wrongful conduct as set forth herein, Plaintiff has sustained and will continue to sustain severe physical injuries, severe emotional distress, mental anguish, economic losses and other damages, as set forth herein.

253.     As a direct result of Wright's failure to warn and/or inadequate warning and Defendant's other tortious conduct, Plaintiff has suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

254.     As a direct and proximate result of Wright's failure to warn and/or inadequate warning and its other tortious conduct, as set forth herein, Plaintiff has suffered and will continue to suffer injuries, damages and losses, and is entitled to compensatory damages in an amount to be determined by the trier of fact.

255.    Plaintiff contends that Defendant's conduct is attended by circumstances of oppression, fraud, malice, willfulness, wantonness, or with reckless or conscious disregard for human life and safety, so as to warrant the imposition of punitive damages.

## FOURTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION & WANTONNESS

256.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows:

257.    Defendant has an obligation to not violate the law in the manufacture, design, testing, assembly, inspection, labeling, packaging, supplying, marketing, selling, advertising, preparing for use, warning of the risks and dangers of the Device, and otherwise distributing the Wright Conserve® Total Hip System and its related components.

258.    Wright had a duty to accurately and truthfully represent to the medical community, Plaintiff, and the public that the Conserve® Total Hip System had not been adequately tested nor found to be safe and effective for the treatment of patients requiring a hip replacement.  Instead, Wright made representations about the Device that it, at a minimum, should have known to be false.

259.    Wright negligently misrepresented to the medical community, implanting orthopedic surgeon Dr. Barnes, Plaintiff, and the public that the Conserve® Total Hip System presented no risk or a low risk of unreasonable and dangerous adverse side effects.

260.    Had Wright accurately and truthfully represented to the medical community, Dr. Barnes, Plaintiff, and the public the material facts that it knew or should have known regarding the risks of the Conserve® Total Hip System, Plaintiff and/or Plaintiff's healthcare provider(s) would not have utilized Wright's Conserve® Total Hip System.

261.    Defendant's acts and omissions constitute an adulteration, misbranding, or both, as defined by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 331 (a) and 333(a)(2), and constitute a breach of duty subjecting Defendants to civil liability for all damages arising there from.

262.    As a direct and proximate result of Wright's negligent misrepresentations, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

263.    Plaintiff contends that Defendant's conduct is attended by circumstances of oppression, fraud, malice, willfulness, wantonness, or with reckless or conscious disregard for human life and safety, so as to warrant the imposition of punitive damages.

## FIFTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

264.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows:

265.    Wright had a duty to accurately and truthfully represent to the medical community, Plaintiff, and the public that Wright Medical Conserve® Total Hip System, had not been adequately tested and found to be safe and effective for the treatment of patients requiring a hip replacement. Instead, Wright knew, but deliberately failed to communicate this to Plaintiff or Plaintiff's surgeon.

266.    Wright had a duty to inform, but fraudulently concealed from the medical community, implanting orthopedic surgeon Dr. Barnes, Plaintiff, and the public that the Wright

Medical Conserve® Total Hip System had an unreasonable and dangerous risk of generating metal debris and metal ions causing bodily injury.

267.    Wright knew of the risk of metal debris and corrosion and resulting bodily injury present in the device implanted in Plaintiff, while neither Plaintiff nor Plaintiff's implanting surgeon had this information.  Neither Plaintiff nor implanting surgeon could have discovered this information through reasonable diligence.

268.    Wright had a duty to communicate the increased risk and known failures associated with the Device implanted in Plaintiff to Plaintiff and Plaintiff's surgeon.

269.    Plaintiff and Plaintiff's surgeon justifiably relied upon Wright to communicate known risks and failures in both the decision to implant the device and follow up treatment after index surgery.

270.    Had Wright accurately and truthfully represented to the medical community, Dr. Barnes, Plaintiff, and the public the material facts that it knew regarding the risks of the Conserve® Total Hip System, Plaintiff and/or Plaintiff's healthcare provider(s) would not have utilized Wright's Conserve® Total Hip System.

271.    Had Wright not fraudulently concealed the increased risk of metal debris, metal ions and corrosion, the dangers from corrosion and metal debris, the known failures of the device from Plaintiff or Plaintiff's surgeon, Plaintiff's injuries would have been avoided or limited.

272.    As a direct and proximate result of Wright's fraudulent concealments, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

273.     Plaintiff contends that Defendant's conduct is attended by circumstances of oppression, fraud, malice, willfulness, wantonness, or with reckless or conscious disregard for human life and safety, so as to warrant the imposition of punitive damages.

### SIXTH CAUSE OF ACTION
### FRAUDULENT MISREPRESENTATION

274.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows:

275.     Wright made false representations of material fact to Plaintiff and/or his healthcare providers as to the safety and efficacy of its Conserve® Total Hip System before it was selected and utilized in Plaintiff's hip replacement surgery.

276.     Instead of disclosing the heightened risks of corrosion, failure, and permanent injury, Wright represented via printed literature and statements to surgeons:

   a)  that there was no indication of an increased risk of adverse events due to metal-on-metal articulation-generated fretting and corrosion;

   b)  that cobalt and chromium metal ions had been tested clinically;

   c)  that the clinical testing had shown that exposure to cobalt and chromium metal ions had proved them to be safe;

   d)  that cobalt-chromium articulating components resulted in less wear than metal-on-polyethylene and would last longer; and

   e)  that the Conserve® Total Hip System, including its component parts, were safe and effective, and were safer and more effective than other treatments for hip replacements.

277.     Wright knew that the above representations alleged in paragraph 281 were false, yet willfully, wantonly, and recklessly disregarded the inaccuracies in its representations.

278.     Wright made these false representations with the intent of defrauding and deceiving the medical community (including implanting surgeon Dr. Barnes, Plaintiff, and the public), and to induce the medical community, Plaintiff's implanting surgeon, Plaintiff and the public to utilize its Conserve® Total Hip System.  Doing so constituted a callous, reckless, willful, and depraved indifference to the health, safety, and welfare of Plaintiff and the public.

279.     Plaintiff and his implanting orthopedic surgeon Dr. Barnes reasonably and justifiably relied upon Wright's false representations of material fact in deciding to utilize the Conserve® Total Hip System.

280.     Had Plaintiff or his healthcare providers known the true facts about the dangers and health risks of the Wright Conserve® Total Hip System, they would not have utilized the Device.

281.     As a direct and proximate result of Wright's fraudulent conduct, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

282.     Plaintiff contends that Defendant's conduct is attended by circumstances of oppression, fraud, malice, willfulness, wantonness, or with reckless or conscious disregard for human life and safety, so as to warrant the imposition of punitive damages.

### SEVENTH CAUSE OF ACTION
### UNJUST ENRICHMENT

283.     Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further allege as follows:

284.   As the intended and expected result of the conscious wrongdoing, Defendant has profited and benefited from the purchase of Defendant's Wright Conserve® Total Hip System by Plaintiff.

285.   Defendant has voluntarily accepted and retained these profits and benefits, derived from Plaintiff, with full knowledge and awareness that, as a result of Defendant's fraud and other conscious and intentional wrongdoing, Plaintiff was not receiving a product of the quality, nature or fitness that had been represented by Defendant or that Plaintiff, a reasonable consumer, expected.

286.   By virtue of the conscious wrongdoing alleged above, Defendant has been unjustly enriched at the expense of Plaintiff, who is entitled to in equity, and hereby seeks, the disgorgement and restitution of Defendant's wrongful profits, revenues and benefits, to the extent and in the amount deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy the Defendants unjust enrichment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and an award of damages against Wright, as follows:

(a)   for special damages, to include past and future medical and incidental expenses, according to proof;

(b)   for past and future loss of earnings and/or earning capacity, according to proof;

(c)   for past and future general damages, to include pain and suffering, emotional distress and mental anguish, according to proof;

(d)   for exemplary and punitive damages in an amount to be determined at trial;

(e)   for pre-judgment and post-judgment interest;

(f)     for the costs of this action, including reasonable attorneys' fees; and

(g)     granting any and all such other and further legal and equitable relief as the Court deems necessary, just and proper.

## JURY TRIAL DEMANDED

Plaintiff respectfully demands a trial by jury as to all claims and causes of action.

Dated:  July 8, 2020                                    Respectfully submitted,

_____
Christopher D. Jennings, AR Bar No. 2006306
Linville Johnson PLLC
610 President Clinton Avenue
Suite 310
Little Rock, AR 72201
T: (501) 372-13000
F: (888) 505-0909
E: chris@yourattorney.com


Alex C. Davis, (*Pro Hac Vice forthcoming*)
JONES WARD PLC
The Pointe
1205 E. Washington St., Suite 111
Louisville, KY 40206
T: (502) 882-6000
F: (502) 587-2007
E: alex@jonesward.com

*Counsel for Plaintiff*